# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1339
_____

Hallmark Specialty Insurance Company

*Plaintiff - Appellee*

v.

Phoenix C & D Recycling, Inc.

*Defendant - Appellant*

R & A Properties, Inc.

*Defendant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: January 14, 2021
Filed: June 1, 2021

_____

Before COLLOTON, WOLLMAN, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

    Phoenix C & D Recycling, Inc. and its property owner, R & A Properties, Inc., (collectively, Phoenix) operate a trash recycling plant in Des Moines, Iowa. In July

2017, a fire began from a pile of biofuel material located on Phoenix's property. Hallmark Specialty Insurance Co. (Hallmark), Phoenix's insurer, made several payments to Phoenix for Phoenix's losses, but after disagreements as to those payments arose, Hallmark filed an action with the district court[1] seeking declaratory judgment that it did not breach the insurance policy or act in bad faith when adjusting Phoenix's claims.  Phoenix asserted three counterclaims, and after the parties filed cross-motions for summary judgment, the district court granted Hallmark's motion in its entirety and granted Phoenix's motion in part.  Phoenix now appeals the district court's grant of summary judgment in favor of Hallmark.[2]  Having jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.[3]

I.

Phoenix operated a recycling plant in Des Moines, Iowa, recycling construction debris and producing biofuel from wood materials.  On July 6, 2017, a fire began at Phoenix's plant.  At the time of the fire, Phoenix had nearly 18,000 tons of biofuel on its property, and the fire originated from a pile of this biofuel located at the southeast corner of the plant.  Pursuant to a policy effective April 16, 2017, Hallmark insured Phoenix with coverage for property damage and business interruption of up to approximately $6.5 million.  Phoenix provided Hallmark with

---

[1]The Honorable John A. Jarvey, Chief Judge, United States District Court for the Southern District of Iowa.

[2]Phoenix does not appeal the district court's summary judgment ruling insofar as it granted summary judgment in favor of Hallmark on Phoenix's breach of contract counterclaim.

[3]Hallmark also filed two motions to strike, seeking to strike portions of affidavits that Phoenix relied on in its motion for summary judgment and in its resistance to Hallmark's motion for summary judgment.  However, because the district court granted Hallmark's motion for summary judgment in full, it denied Hallmark's motions to strike as moot.  These motions to strike are not before us on appeal.

notice of its fire loss on or about July 10, 2017. This loss included damage to buildings, wiring, equipment, and other materials located on Phoenix's property.

Hallmark assigned Bryan Jones, a "Property Claims Supervisor," to Phoenix's claimed loss and subsequently hired 11 different experts and consultants to also evaluate the loss. There are two experts and consultants pertinent to this appeal: Larry Baxter and HSNO. Hallmark hired Baxter, a mechanical engineer, to assess Phoenix's wiring and equipment damage. Baxter created a report, dated July 31, 2017, that included three different estimates for equipment loss: (1) actual cash value of $368,520; (2) replacement cost value of $1,226,400; and (3) repair cost of $93,600. R. Doc. 38-9, at 59. Within Baxter's report was an estimate of $124,800 for removal and replacement of wiring and equipment, including equipment removal and installation labor cost; replacement of electrical wiring cost; and a contingency fee. R. Doc. 38-9, at 59. In a separate report, R. Doc. 38-12, at 20, Jones characterized the electrical wiring replacement cost as being included in the replacement cost value category. Jones later confirmed this classification in a supplemental declaration, stating, "Based on [Baxter's] report, my understanding at the time was that the electrical equipment should be depreciated and allocated as [r]eplacement [c]ost [v]alue." R. Doc. 47-4, at 8. On October 18, 2017,[4] Hallmark paid Phoenix $200,720 under its equipment loss coverage. This amount did not include compensation for removal and installation of wiring and equipment because, Hallmark contended, the policy did not require such payment until damaged property had been repaired or replaced. Hallmark did eventually compensate Phoenix for its damaged wiring and equipment (as well as the associated labor costs and contingency fee): Hallmark included the $124,800 in its July 6, 2018 "compromise" payment, which exceeded $1 million. However, Phoenix contends that Hallmark

---

[4]Appellant's brief characterizes this payment as occurring on October 18, 2017, and the district court characterizes this payment as occurring both on October 18, 2017, and on the following day, October 19, 2017. This discrepancy does not affect our analysis, and for consistency, we characterize this payment as occurring on October 18, 2017.

should have paid the $124,800 for removal and replacement of wiring and equipment on October 18, 2017.

Hallmark also hired HSNO, an accounting firm, in anticipation of Phoenix's business income interruption claim. HSNO began requesting information regarding any such claim in November 2017. In response, on December 1, 2017, Phoenix provided financial information for 2015, 2016, and through October 2017. At this time, Phoenix stated that "[t]he business income/extra expense loss exceeds $530,000," R. Doc. 59, at 21 (alteration in original), and demanded a $200,000 advance. However, at the time of its demand, Phoenix had not provided complete financial information to HSNO or to Hallmark—namely, financial information covering the time period beyond October 2017. HSNO then provided Hallmark with a preliminary calculation of business income loss totaling $28,774.34. HSNO characterized 94.16% of the expenses included in its calculation as "non-continuing," meaning that no continuing payroll expenses were incorporated into the estimate. HSNO expressly told Jones that this calculation was preliminary, as it was subject to "additional discussions, and new information, including continuing payroll." R. Doc. 59, at 22. Jones then relayed this calculation to Phoenix, alerting Phoenix of the calculation's preliminary status. In response, Phoenix submitted to Hallmark a proof of loss for $28,774.34 coupled with a letter disputing HSNO's calculation. Phoenix did not provide a proposed alternative calculation or the missing financial information. Instead, it simply alleged that it had provided sufficient financial information and that, based on that information, it was entitled to a larger payment. On January 9, 2018, Hallmark advanced Phoenix $28,774.34 under the policy's business interruption coverage.

Hallmark brought an action in district court for declaratory judgment that it did not breach the insurance policy or act in bad faith when adjusting Phoenix's claims, and Phoenix brought three counterclaims, seeking punitive damages and contending that although Hallmark ultimately paid all sums owed under the policy, it breached the terms of the policy, acted in bad faith, and breached its fiduciary duty to Phoenix by delaying the payment of policy benefits. The parties filed cross-

motions for summary judgment, and ultimately, the district court granted Hallmark's motion for summary judgment in its entirety and granted Phoenix's motion in part.[5] We find that the district court did not err, and we affirm in full.[6]

## II.

"We review de novo the district court's grant of summary judgment." Van Dorn v. Hunter, 919 F.3d 541, 544 (8th Cir. 2019) (citation omitted). "Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Kempf v. Hennepin Cnty., 987 F.3d 1192, 1195 (8th Cir. 2021).

On appeal, Phoenix abandons many of the claims that it raised before the district court and challenges only the district court's grant of summary judgment in favor of Hallmark on Phoenix's bad faith claim and Hallmark's claim for declaratory judgment, and on Phoenix's request for punitive damages. We agree with the district court's thoughtful analysis of these claims and affirm.[7]

"To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." Dolan v.

---

[5]The district court granted Phoenix's motion for summary judgment, denying Hallmark's request for attorney's fees.

[6]In its motion for summary judgment on Phoenix's breach of fiduciary duty counterclaim, Hallmark argued that no such cause of action was available for first-party insurance actions. In response, Phoenix did not resist Hallmark's motion for summary judgment on Phoenix's breach of fiduciary duty counterclaim. That claim is not before us on appeal.

[7]"When exercising diversity jurisdiction, as we do here, we apply the forum state's substantive law to any state-law claims." May v. Nationstar Mortg., LLC, 852 F.3d 806, 813 (8th Cir. 2017). Therefore, here we apply Iowa law to Phoenix's bad faith claim.

Aid Ins. Co., 431 N.W.2d 790, 794 (Iowa 1988) (citation omitted); see also Rodda v. Vermeer Mfg., 734 N.W.2d 480, 483 (Iowa 2007) (explaining that a plaintiff must prove that the insurer "had no reasonable basis for denying benefits under the policy" and that "the insurer knew, or had reason to know, that its denial was without basis" (citation omitted)). "The first element is an objective one; the second element is subjective." Rodda, 734 N.W.2d at 483 (citation omitted). As the district court correctly noted, we consider the second element only if we find that the insurer did not have a reasonable basis to deny the insured's claim. R. Doc. 59, at 15; see also Rodda, 734 N.W.2d at 483.

The first element is not satisfied if the "claim is 'fairly debatable' as to either a matter of fact or law." Rodda, 734 N.W.2d at 483 (citation omitted); see also Thornton v. Am. Interstate Ins. Co., 897 N.W.2d 445, 465 (Iowa 2017) ("'[W]here an objectively reasonable basis for denial of a claim actually exists, the insurer cannot be held liable for bad faith as a matter of law.' '[C]ourts and juries do not weigh the conflicting evidence that was before the insurer; they decide whether evidence existed to justify denial of the claim.'" (second alteration in original) (emphasis omitted) (citation omitted)). Iowa courts find several principles important to the first element's analysis. First, "[t]he reasonable basis for denying the claim . . . must exist at the time the claim is denied." Seastrom v. Farm Bureau Life Ins. Co., 601 N.W.2d 339, 346 (Iowa 1999). Second, although an insurer *may* conduct an investigation of an insured's claims, there is no duty of investigation on the insurer, Bellville v. Farm Bureau Mut. Ins. Co., 702 N.W.2d 468, 478 (Iowa 2005), and "an imperfect investigation, standing alone, 'is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim,'" Villarreal v. United Fire & Cas. Co., 873 N.W.2d 714, 728 (Iowa 2016) (citation omitted); see also Reuter v. State Farm Mut. Auto. Ins. Co., 469 N.W.2d 250, 254-55 (Iowa 1991). Third, "[t]here must be evidence that the basis for [the insurer's] valuation was unreasonable," and the insurer is "not obligated to disregard the opinion of its own expert in favor of the insured's expert's opinion." Bellville, 702 N.W.2d at 475, 477 (emphasis omitted).

On appeal, Phoenix argues that although Hallmark eventually paid all sums owed under the policy for business interruption, Hallmark acted in bad faith when, on January 9, 2018, it paid Phoenix only $28,774.34 rather than the $200,000 that Phoenix demanded. Phoenix contends that, based on the financial information Phoenix submitted to Hallmark on December 1, 2017, this payment should have included continuing payroll costs but did not. The crux of Phoenix's argument is that it was unreasonable for Hallmark to rely on HSNO's report—because, Phoenix alleges, that report was flawed—and from this unreasonableness, bad faith can be inferred. See, e.g., Appellant Br. 15-16 ("[B]ad faith may be inferred from a flawed or inadequate investigation by the insurer. . . . The [district court], in allowing Hallmark to rely on the HSNO report, fails to consider the fact that the report is unreasonable." (citation omitted)). In response, Hallmark points out that Phoenix agrees that it ultimately received the total amount of business interruption benefits to which it was entitled and only argues that Hallmark should have paid more than $28,774.34 on January 9, 2018. See, e.g., Appellant Br. 20 ("The fact an insurer ultimately pays benefits due under the contract does not relieve it from liability for bad faith when it unreasonably delayed payment of those benefits."). Hallmark directs us to the incomplete financial information that Phoenix provided HSNO on December 1, 2017; HSNO's requests to Phoenix for additional financial information; HSNO's calculation of $28,774.34, which was preliminary and subject to change should Phoenix provide the missing financial information; and Phoenix's failure to provide an alternative calculation.

Our role is confined to determining "whether evidence existed to justify [Hallmark's] denial of the claim"; we are *not* tasked with "weigh[ing] the conflicting evidence that was before the insurer." Thornton, 897 N.W.2d at 465 (emphasis omitted); cf. McIlravy v. N. River Ins. Co., 653 N.W.2d 323, 330 (Iowa 2002) (explaining that the plaintiff must "present *substantial* evidence to establish the absence of a reasonable basis by [the insurer] for denying benefits" (emphasis added)). With this in mind, we find that Hallmark had an objectively reasonable basis to initially deny Phoenix's $200,000 business income interruption demand. See Dolan, 431 N.W.2d at 794; Rodda, 734 N.W.2d at 483. On January 9, 2018,

Hallmark relied on HSNO's report, which included estimates of loss calculated from the incomplete financial information Phoenix had provided. HSNO indicated that this $28,774.34 calculation was preliminary and subject to change upon receipt of additional financial information. However, rather than supplying the missing information, Phoenix simply reasserted its belief that it had provided sufficient information and that, based on the financial information provided, it was entitled to a larger payment. Phoenix did not provide an alternative calculation or explain why Hallmark's calculation was incorrect. Based on these facts, we find that Hallmark had an objectively reasonable basis for denying Phoenix's demand and limiting its payment to $28,774.34 on January 9, 2018. See Thornton, 897 N.W.2d at 465. Further, to the extent that HSNO's report included any inaccuracies, "an imperfect investigation, standing alone, 'is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim.'" Villarreal, 873 N.W.2d at 728 (citation omitted).

Phoenix next argues that Hallmark acted in bad faith when it delayed paying the total amount owed under the policy for damage sustained to Phoenix's wiring and equipment. Specifically, Phoenix contends that Hallmark knew, at time of the partial payment in October 2017, that Hallmark's expert's calculation for equipment damage totaled $368,520 but nevertheless paid only $200,720 on that date. Phoenix argues that Hallmark owed Phoenix an additional $124,800 for damage to wiring and equipment.[8] As it did in response to Phoenix's first bad faith argument, Hallmark similarly characterizes this argument as objecting to the timing of

---

[8] Before the district court, Phoenix presented this as two distinct claims: first, that Hallmark acted in bad faith in denying or delaying payment of $124,800 for the removal and installation of wiring and equipment; and second, that Hallmark acted in bad faith by failing to pay Phoenix on October 18, 2017, for equipment loss and repair (i.e., that on October 18, 2017, Hallmark should have paid Phoenix $368,520 based on Baxter's calculation for actual cash value plus $124,800 for the wiring and equipment removal and installation). However, on appeal, Phoenix consolidates this argument, claiming that Hallmark acted in bad faith for "fail[ing] to include $124,800 for damage to wiring and electronic equipment necessary to operate the Phoenix equipment." See Appellant Br. 25.

Hallmark's payments. Hallmark explains, and the district court opinion confirms, that Hallmark *did* pay benefits under the policy for the wiring and equipment damage, but that Hallmark included this payment in its July 8, 2018 "compromise" payment. See R. Doc. 59, at 18 ("[N]o reasonable juror could conclude that the full costs of removal and installation of wiring and electrical components were not included in the [July 6, 2018] 'compromise' payment.").

We find that there was a reasonable basis for Hallmark to deny Phoenix's demand for an additional $124,800 in October 2017. See Dolan, 431 N.W.2d at 794; Rodda, 734 N.W.2d at 483. Although in his report Baxter included an estimate of $124,800 to remove and install wiring and equipment, Jones classified this estimate as part of the replacement cost value category. Hallmark interpreted its policy as not requiring payment for items included in the replacement cost value category until Phoenix had actually repaired or replaced those items—which it had not done as of October 2017. As the district court noted, "Hallmark knew that the Iowa Supreme Court had interpreted comparable policy language as not requiring payment of [replacement cost value] until the associated equipment was actually repaired or replaced." R. Doc. 59, at 17 (citing Pierce v. Farm Bureau Mut. Ins. Co., 548 N.W.2d 551, 554 (Iowa 1996)). This interpretation of the policy—and of Iowa law—constitutes an objectively reasonable basis to deny Phoenix's $124,800 demand in October 2017. See Thornton, 897 N.W.2d at 465.

To the extent that Phoenix argues Hallmark acted in bad faith for failing to pay Phoenix in October 2017 for equipment loss and repair, i.e., that Hallmark should have paid $368,520, we agree with the district court that Hallmark had an objectively reasonable basis for denying Phoenix's claim. Baxter's report indicated that the equipment's replacement cost value was $1,226,400; that the equipment's actual cash value was $368,520; and that the equipment's repair costs were $93,600. Even though Hallmark's October 2017 payment of $200,720 was less than Baxter's recommended $368,520, Hallmark had a reasonable basis to advance only $200,720. Jones concluded that $200,720 was appropriate after considering: repair costs and actual cash value for non-repairable items; the 20% contingencies on all amounts

(per the policy); and the applicable $25,000 deductible (per the policy).  Further, Jones omitted the $124,800 amount (for removal and installation of wiring and equipment) from his calculation for the reasons discussed above.  There is no evidence that this calculation was unreasonable, see Bellville, 702 N.W.2d at 477-78, and it forms an objectively reasonable basis for denial of Phoenix's $368,520 claim, see Thornton, 897 N.W.2d at 465.  Because we find that there *was* a reasonable basis for Hallmark's denial of both the business income interruption claim and the wiring and equipment damage claim, we need not reach the second, subjective knowledge element.  See Rodda, 734 N.W.2d at 483 (explaining that a court needs to reach the second, subjective element only once it has found that the insurer lacked a reasonable basis to deny the insured's claim).  Because we find that summary judgment was appropriate on Phoenix's bad faith claim, it follows that summary judgment was appropriate on Hallmark's declaratory judgment claim.

Next and finally, the district court granted summary judgment to Hallmark on Phoenix's request for punitive damages.  The district court addressed this issue briefly, stating in part, "Because the [district] court has resolved the underlying substantive claims against Phoenix, Phoenix's punitive damages claim is moot, and Hallmark is entitled to summary judgment on that claim."  R. Doc. 59, at 41.  We agree.  See, e.g., Iowa Code § 668A.1 (noting that where a party requests punitive damages, there must be a finding, "by a preponderance of clear, convincing, and satisfactory evidence," that the defendant's conduct "constituted willful and wanton disregard for the rights . . . of another").

III.

For the above-stated reasons, we affirm.

_____